No. 13-4468

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

NERY GUSTAVO RAMOS DUARTE,
a/k/a "El Diablo,"

Appellant.

*Appeal from the United States District Court for the
District of Maryland, Southern Division
Hon. Alexander Williams, Jr., Senior District Judge*

BRIEF OF APPELLEE
UNITED STATES OF AMERICA

Rod J. Rosenstein
United States Attorney

Bonnie S. Greenberg
Andrea L. Smith
Assistant United States Attorneys
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800

April 25, 2014

*Attorneys for the Appellee*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION .........................................................1

STATEMENT OF THE ISSUES .............................................................1

STATEMENT OF THE CASE ..................................................................2

STATEMENT OF FACTS .........................................................................2

    A.    Drug and Cash Seizures ........................................................2

    B.    The Defendant's Border Crossings ....................................5

    C.    Cooperator Testimony .........................................................6

        1. Raul Sandoval. .............................................................6

        2. Marilyn Navas .............................................................8

    D.    Expert Testimony .............................................................13

    E.    Verdict ...............................................................................13

SUMMARY OF ARGUMENT ...............................................................14

ARGUMENT ...........................................................................................17

    I.    THE DISTRICT COURT PROPERLY ADMITTED
        TELEPHONE RECORDINGS AS CO-CONSPIRATOR
        STATEMENTS PURSUANT TO FED. R. EVID. 801(d)(2)(E)
        MADE WHILE THE DEFENDANT WAS A MEMBER OF
        THE ONGOING CONSPIRACY ...................................17

        A.    Standard of Review ................................................17

        B.    Additional Facts.....................................................18

        C.    Analysis ..................................................................20

1.  The Defendant's Argument ....................................20

2.  Diego's Words........................................................20

3.  Navas's Words.......................................................23

II.   THE DISTRICT COURT PROPERLY ADMITTED THE
TESTIMONY   OF   THE   GOVERNMENT'S   MONEY
LAUNDERING EXPERT PURSUANT TO FED. R. EVID.
702 ....................................................................................25

A.  Standard of Review .................................................25

B.  Additional Facts......................................................25

C.  Analysis ...................................................................27

1.  The Testimony was Helpful .............................27

2.  Special Agent DeSantis was Qualified to Testify as an
Expert ..................................................................28

3.  Special Agent DeSantis's Testimony was Proper.................29

III.  THE DISTRICT COURT PROPERLY SUPERVISED
THE CONDUCT OF THE COURTROOM AND DID NOT
LIMIT VALID CROSS-EXAMINATION OF
COOPERATING WITNESSES...........................................32

A.  Standard of Review...................................................32

B.  Analysis....................................................................32

1.  Raul Sandoval....................................................33

2.  Marilyn Navas ...................................................37

IV.  THE DISTRICT COURT PROPERLY PERMITTED TESTIMONY
ABOUT THE DEFENDANT'S NICKNAME AS EVIDENCE OF
HIS IDENTIFICATION .....................................................39

A.  Standard of Review ...................................................................39

B.  Additional Facts.......................................................................40

C.  Analysis .................................................................................42

V.   ASSUMING *ARGUENDO* THAT THERE WAS ERROR, THE
     CUMULATIVE ERROR DOCTRINE DOES NOT REQUIRE
     REVERSAL OF THE DEFENDANT'S CONVICTIONS ...............44

A.  Standard of Review ...................................................................44

B.  Analysis .................................................................................44

VI.  THERE WAS SUFFICIENT EVIDENCE TO SUSTAIN THE
     JURY'S VERDICT AS TO ALL FOUR COUNTS OF THE
     INDICTMENT ...................................................................46

A.  Standard of Review ...................................................................46

B.  Analysis .................................................................................47

     1.  Conspiracy to Distribute and Import Controlled
         Substances ..........................................................................50

     2.   Conspiracy to Launder Money and Smuggle Bulk Cash......53

VII. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING
     THAT THE AMOUNT OF COCAINE ATTRIBUTABLE TO THE
     DEFENDANT WAS 63 KILOGRAMS ...............................................55

A.  Standard of Review ...................................................................55

B.  Analysis .................................................................................55

CONCLUSION...................................................................................62

STATEMENT REGARDING ORAL ARGUMENT ...........................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Delaware v. Fensterer*, 474 U.S. 15 ........................................................36

*Hamling v. United States,* 418 U.S. 87 (1974) ......................................25

*Puckett v. United States,* 556 U.S. 129 (2009) ......................................18

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010)..........................17

*United States v. Barber*, 80 F.3d 964 (4th Cir. 1996)..............................31

*United States v. Barnett*, 63 Fed. Appx 643, 2003 WL 1861569 (4th Cir. 2003)...31

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ..........................44

*United States v. Beidler*, 110 F.3d 1064 (4th Cir. 1997) .................. 46, 47

*United States v. Bell*, 367 F.3d 452 (5th Cir. 2004)......................... 16, 44

*United States v. Borda*, 178 F.3d 1286, 1999 WL 29450 (4th Cir. 1999)..............19

*United States v. Brewer*, 1 F.3d 1430  (4th Cir.1993) ..............................40

*United States v. Brooks*, 957 F.2d 1138 (4th Cir. 1992)..........................58

*United States v. Burgos*, 94 F.3d 849 (4th Cir.1996) ..............................47

*United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011) ......................18

*United States v. Carrington*, 301 F.3d 204 (4th Cir. 2002) .....................57

*United States v. Carter*, 300 F.3d 415 (4th Cir. 2002) ...........................57

*United States v. Cedelle*, 89 F.3d 181 (4th Cir. 1996).............................18

*United States v. Clark*, 541 F.2d 1016 (4th Cir. 1976)...................... 42, 43

*United States v. Cook*, 76 F.3d 596 (4th Cir. 1996)....................................................58

*United States v. Cropp*, 127 F.3d 354 (4th Cir. 1997)..............................................33

*United States v. Diaz-Calderon*, 216 Fed. Appx. 331 (4th Cir. 2007) ...................60

*United States v. Diaz-Cardenas*, 351 F.3d 404 (9th Cir. 2003) ............................52

*United States v. Edelen*, ___Fed.Appx.____, 2014 WL 961565, *7

    (4th Cir. 2014.)....................................................................................................24

*United States v. Ellis*, 975 F.2d 1061 (4th Cir. 1992)...............................................58

*United States v. Fernandez*, 559 F.3d 303 (5th Cir. 2009)......................................51

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) .............................................45

*United States v. Fullilove*, 388 F.3d 104 (4th Cir. 2004)................................. 55, 60

*United States v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994)............................... 25, 28

*United States v. Guerrero-Damian*, 241 Fed.Appx. 171, 173, 2007 WL 2326818

    (4th Cir. 2007) ....................................................................................................24

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013).............................................44

*United States v. Hassan El*, 5 F.3d 726, 731 (4th Cir.1993) ...................................39

*United States v. Hastings*, 134 F.3d 235 (4th Cir. 1998)........................................17

*United States v. Hicks*, 948 F.2d 877 (4th Cir.1991) ...............................................59

*United States v. Holmes*, 384 Fed. Appx. 219, 2010 WL 254601
    (4th Cir. 2010)....................................................................................................48

*United States v. Kiulin*, 360 F.3d 456 (4th Cir. 2004) ................................ 55, 58, 59

*United States v. Lopez*, 219 F.3d 343 (4th Cir. 2000) .............................55

*United States v. Manigan*, 592 F.3d 621 (4th Cir.2010).........................55

*United States v. Mann*, 712 F.2d 941 (4th Cir. 1983).............................30

*United States v. Marcus*, 560 U.S. 258  (2010) ......................................17

*United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009)....................61

*United States v. Offill*, 666 F.3d 168 (4th Cir. 2011)..............................28

*United States v. Pratt*, 239 F.3d 640 (4th Cir. 2001).......................*passim*

*United States v. Pugliese*, 712 F.2d 1574 (4th Cir. 1983) .............................. 27, 28

*United States v. Ramos*,  476 F.2d 624 (9th Cir.1973) ............................51

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999) .........................58

*United States v. Safari*, 849 F.2d 891 (4th Cir. 1988) ............................... 24, 25, 27

*United States v. Sampson*, 140 F.3d 585 (4th Cir. 1998)........................59

*United States v. Sanchez-Mata*, 925 F.2d 1166 (9th Cir. 1991) ................ 51, 52, 53

*United States v. Shelton*, 200 Fed.Appx. 219, 2006 WL 2640254
    (4th Cir. 2006)............................................................................... 32, 39

*United States v. Smith*, 451 F.3d 209 (4th Cir. 2006)................................ 32, 47, 49

*United States v. Snow*, 462 F.3d 55 (2d Cir. 2006) .................................57

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948)........................55

*United States v. Urrego-Linares*, 879 F.2d 1234 (4th Cir. 1989).................... 22, 23

*United States v. Villarreal*, 185 Fed. Appx. 260, 2006 WL 1667444
    (4th Cir. 2006)..................................................................................28

*United States v. Williams*, 986 F.2d 86 (4th Cir. 1993)...........................................57

*United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999)............................................47

## Statutes

18 U.S.C. § 371 ........................................................................................1

18 U.S.C. § 1956(h) ...................................................................................1

18 U.S.C. § 3731 .......................................................................................1

18 U.S.C. § 3742(a) ...................................................................................1

21 U.S.C. § 846 ........................................................................................1

21 U.S.C. § 963 ........................................................................................1

28 U.S.C. § 1291 .......................................................................................1

## Rules

Fed. R. Evid. 702 ....................................................................................25

Fed. R. Evid. 801(d)(2)(A) ..................................................................... 14, 20

Fed. R. Evid. 801(d)(2)(E) ................................................................ 14, 17, 19, 22

U.S.S.G. § 1B1.3 .................................................................................. 57, 60

U.S.S.G. § 2B3.1(b)(7) ...........................................................................61

U.S.S.G. § 2D1.1 .............................................................................. 56, 58, 61

## STATEMENT OF JURISDICTION

A federal grand jury charged the defendant with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; conspiracy to import controlled substances, in violation of 21 U.S.C. § 963; conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h); and conspiracy to smuggle bulk cash outside of the United States, in violation of 18 U.S.C. § 371.

The district court (Alexander Williams, Jr., J.) had jurisdiction over this federal criminal case pursuant to 18 U.S.C. § 3731.  This Court has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.  Whether The District Court Committed Plain Error in Admitting Telephone Recordings Made by a Cooperating Witness While the Defendant was a Member of the Ongoing Conspiracy.

II.  Whether The District Court Properly Admitted the Testimony of the Government's Money Laundering Expert.

III.  Whether The District Court Properly Exercised Its Broad Discretion in Limiting the Cross-Examination of Cooperating Witnesses.

IV.  Whether the District Court Properly Permitted Testimony about the Defendant's Nickname as Evidence of His Identification.

V.  Whether the Cumulative Error Doctrine Requires Reversal of the Defendant's Convictions Where None of the Alleged Errors Violated the Trial's Fundamental Fairness.

1

VI.     Whether there was Sufficient Evidence to Sustain the Jury's Verdict as to All Four Counts of the Indictment.

VII.    Whether the District Court Clearly Erred in Finding that the Amount of Cocaine Attributable to the Defendant was 63 Kilograms.

## STATEMENT OF THE CASE

The government agrees with the defendant's Statement of the Case.

## STATEMENT OF FACTS

Nery Ramos Duarte was a member of an international drug organization operating between Guatemala and numerous locations in the United States, including the Baltimore-Washington metropolitan area, Chicago, Connecticut, and elsewhere.  Two cooperating witnesses testified that the source of the cocaine they personally distributed in Maryland was Napolean Villagran (known as "Napo"), who controlled this organization.  The evidence at trial confirmed that Duarte was one of several trusted members of Villagran's organization.

### A.     Drug and Cash Seizures

On September 25, 2003, Deputy Sheriff Jeffrey Smith, Crawford County, Arkansas, was stationed at the twelve-mile marker on the westbound side of Interstate 40.  JA 149-50.   Smith observed a Chevy Tahoe, driven by defendant Duarte, traveling westbound with no visible vehicle tags.  JA 151.   Smith stopped the Tahoe for the traffic violation.  JA 151-52.

A video recorder in Smith's police cruiser recorded the entire stop of the Tahoe. JA 153. The video was played for the jury. JA 155-72. Deputy Smith approached the defendant, the sole occupant in the Tahoe, advised him of the traffic violation, and observed in the rear wheel well what Smith believed was indicia of an after-market, non-factory hidden compartment. JA 154, 156-57. After conducting routine checks on the defendant and the vehicle, Smith obtained consent from the defendant to search the vehicle. JA 159-60. Upon opening the back of the Tahoe, Smith immediately noticed the "overwhelming smell of Bondo," a filler used in auto-body shops. JA 160-61. After removing items packed in the back of the Tahoe, Smith observed "tool marks on the weather stripping . . . that holds the carpet down." JA 165. Smith "removed the carpet . . . [and] was able to bust through some of the Bondo and pried it back with a hammer." JA 166. He discovered 42 duct-taped packages marked with amounts of currency, such as "$60,000." JA 166-70. Law enforcement recovered over $1,000,000 in cash that day from the vehicle the defendant was driving. JA 171.

Sergeant Sean Martin, Chicago Police Department, testified to his observations in the days preceding the Arkansas cash seizure by Deputy Smith. Martin was investigating narcotics activity in the Chicago area. JA 222. Only two days earlier, on September 23, 2003, Martin was conducting surveillance at a home

3

at 1425 North Wolf Road, in Berkeley, Illinois.  JA 222.  During the early afternoon hours, Martin observed a Hispanic male on a cell phone leaving the home.  JA 228.  Martin identified that person, through a photograph offered into evidence, as Napolean Villagran.  JA 228-29.

Sergeant Martin was again conducting surveillance on the home at Wolf Road on September 24, 2003.  JA 231-32.  Martin observed two men at the rear of a blue SUV vehicle, which was parked in the driveway alongside the residence. The vehicle was similar to the Chevy Tahoe stopped the next day in Arkansas.  JA 232.  The two men appeared to be loading things into the blue SUV from the nearby garage.  JA 233.  Martin followed the blue SUV to a Citgo gas station, where it was filled up with gas.  JA 235.  A black SUV, driven by Napolean Villagran, followed the blue SUV to the gas station, did not get gas, and appeared to be "mak[ing] sure that the [other] vehicle was safe."  JA 234-35; JA 237.  Both vehicles then returned to the home at Wolf Road.  JA 235-36.  Shortly thereafter, Martin followed the blue SUV south on Interstate 55, for "well over an hour," where Illinois state troopers stopped the SUV at Martin's request.  239, 245.  The defendant was the driver and sole occupant of the blue SUV.  JA 246-47.[1]

_____

[1]    There is some confusion in the testimony about the make and model of these vehicles.  Martin described seeing both a blue Suburban and a black Tahoe.  JA 233-34.  These vehicles were both Chevrolets and visually similar.  Based upon the

4

Martin watched the interaction between the state trooper and the defendant. JA 246-48. The troopers looked inside the defendant's vehicle, did not remove any of the items packed in the back, did not make any seizures, and ultimately let him go. Martin observed the defendant's vehicle continue southbound on Interstate 55. JA 248.

Martin then described the ongoing investigation of the men who had been observed at the Wolf Street address. JA 226; JA 248-57. This investigation included a court-authorized wiretap, and the seizure of two kilograms of 85% pure cocaine. JA 253-55.

## B.    The Defendant's Border Crossings

Agent Bill Stewart of Customs and Border Patrol testified as to his training and experience as a border patrol agent. JA 274. Stewart testified as to the need for and the definition of a Currency Monetary Instrument Report (CMIR). JA 274-77. Specifically, Stewart explained that an individual must file a CMIR when he or she transports more than $10,000 across the U.S. border. JA 273-77. Stewart also described the use and purpose of Customs Form 6059B, which is the Customs

---

surveillance by Martin, who testified to following the "Blue Suburban" driven by defendant Duarte from the home on Wolf Street and south out of Chicago, and based upon Deputy Sheriff Smith's testimony that he stopped the defendant the next day driving a "Blue Tahoe," JA 151-52, the government submits that it was actually a Blue Tahoe that Martin followed, not a blue Suburban.

5

Declaration all airline passengers are required to complete upon entering the United States. JA 277-78. Finally, Stewart described the information gathered at the borders for all persons leaving or entering the United States, and the difference between the information gathered and stored if the person was coming in or out, and if the person was on foot, in a car, or in an airplane. JA 282-83. Records of border crossings for the defendant were entered into evidence reflecting that between January 2, 2000 and October 23, 2010, Duarte entered the United States 58 times. JA 283-87.

### C.    Cooperator Testimony

Two members of the same organization, both of whom were cooperating with the government, testified at trial.   Jose Raul Sandoval and Marilyn Navas grew up in Chiquimula, Guatemala, a small town in southwestern Guatemala. They both knew Napolean Villagran and worked for his drug organization in the United States. JA 341, 389, 404. These witnesses described their involvement in this drug conspiracy, and their interactions with the defendant.

### 1.    Raul Sandoval

Sandoval came to the United States illegally and to Maryland in approximately 2002. JA 342, 366. Sandoval knew Villagran "since they were children." JA 389. Sandoval described working in Maryland with another man,

6

Martin Guerra, who also was from Chiquimula, Guatemala. Guerra, who lived near Sandoval in Langley Park, Maryland, sold kilograms of Villagran's cocaine. JA 342-51, 367. It was through Guerra that Sandoval came to work for Villagran. JA 343. At first, Sandoval received packages from Guatemala with "cocaine hidden inside of things." JA 343. These things included "candles, like sticks for hammocks, beer, cheese . . . different things." JA 344. These packages were from "Napo," which was Sandoval's nickname. JA 344. Sandoval said, "Napo would send me the stuff through FedEx sometimes and sometimes there was a gentleman from Miami that would come and bring me the packages." JA 352. Sandoval said he and Guerra received cocaine shipments every week, "eight kilos some weeks, ten kilos another. Sometimes it would go up to twenty." JA 345, 351.

Sandoval described how the cash proceeds from the sale of cocaine made it back to Villagran. He explained that Villagran instructed him as to two different methods to use in order to return the drug proceeds to Villagran in Guatemala. JA 346-48. One method was to use couriers that flew to Guatemala weekly. One such courier business was "Fito," in Langley Park. JA 347, 358. Sandoval described bringing between $60,000 and $120,000 to Fito at a time every week, so that the money could be carried to Guatemala and delivered to Villagran. JA 349. A second method of getting the cash back to Villagran was through deposits into

7

bank accounts through the account numbers Villagran provided.  JA 350.  At trial, the government introduced photographs of a FedEx package seized from Sandoval's home in 2005, which contained candles and a framed decorative mask. Law enforcement agents seized approximately two kilograms of 77% pure cocaine from inside the broken mask, which had been sent to Sandoval by Villagran.  JA 352-54.

Sandoval described times when he owed Villagran money.  JA 355. Sandoval specifically recalled a time when a man who identified himself as "Nery" called and directed Sandoval to call Villagran about the "drug money . . . that [Sandoval] owed to Napo."  JA 357.  Sandoval never met "Nery" and did not know what he looked like.  JA 357.  Sandoval identified photographs of Napo/Sandoval, Martin Guerra, and Walter Velasquez, the man at Fito with whom he dealt at Villagran's direction.  JA 358.

2. <u>Marilyn Navas</u>

Navas described leaving her home in Chiquimula, Guatemala in approximately 2003, when she was 20 years old.  JA 404-06.  She had family in California and went to stay with them.  JA 406.   Before she left Guatemala, Navas went on a date with Napolean Villagran, whom she knew as "Napo."  JA 406-07. Navas knew that Napo was a drug dealer.  JA 407.  Navas identified Villagran's

8

photograph as the person she knew as Napo.  JA 406.   While living in Connecticut and Maryland, Navas and her boyfriend, Edgar, sold kilograms of cocaine for Villagran.  JA 416-19.

Navas identified photographs of others who worked for Villagran, including Diego Paredes (JA 407), Walter Velasquez (JA 411), and Martin Guerra (JA 413). Navas described Diego Paredes as a "middle man."  JA 408.  She explained that she would speak with Paredes on the telephone about selling Villagran's drugs in the United States.  JA 409.  When asked why she did not speak directly with Villagran instead, Navas explained that Villagran did not want to get caught and therefore allowed others in the organization to take the risk of talking on the phone. JA 410.  Navas identified Walter Velasquez as the man "working at the place [Fito] where we used to drop off the money . . ."  JA 411.  She explained that the money was from the sale of drugs, and that Diego instructed her to take the money to Fito.  Navas knew that the money ultimately was for Villagran.  JA 412.  Navas knew Martin Guerra as someone who sold drugs for Napo.  JA 413.

Navas also identified the defendant as a member of this drug organization. JA 422.  She knew him as "Nery."  JA 422.

In 2004, Navas and her boyfriend, Edgar, were living in Connecticut and were getting two kilograms of cocaine "every week or every two weeks" from

Villagran in Guatemala.  JA 416-18.   Navas described how the money got back to

Villagran.  Two of the methods were identical to those described by Sandoval:

through Fito Express and through depositing "money into a bank account."  JA

419, 461.  Navas explained that either Villagran or Diego "were telling us where to

deposit the money."  JA 419.

Navas also explained that both her boyfriend and the defendant, Nery

Duarte, had also carried money to Guatemala from the United States.  JA 421-24.

This was a third way to get the money to Napo.  Navas knew that Nery had lost

money once in the past.  JA 451.  Navas said they also used cars as a means to pay

back the drug money owed to Villagran.  JA 421-24.  Specifically, the cars would

be purchased in the United States and sold in Guatemala, with the proceeds going

to Villagran as payment for the drugs.  JA 424.

Navas described occasions when she and Edgar owed Villagran money for

cocaine.  JA 424-26.  On one occasion, Edgar owed Villagran $75,000.  JA 425.

Navas explained that "people in my country [Guatemala], they fix problems by

killing you or killing your family.  That's how they solve problems."  JA 443.

Navas described a Mercedes-Benz that Edgar purchased to repay part of his debt to

Villagran.  Edgar told Navas to give the car to "Nery," the defendant, to take to

Villagran in order to satisfy a portion of  Edgar's debt.  JA 424-26.  Nery came to

10

their house in Connecticut and took the car.  JA 426.  Navas explained, "Nery was

supposed to give it to [Villagran].  Drive it all the way to Guatemala."  JA 426.

She gave the defendant the car, but it never made it to Villagran, because the police

seized the car from Nery due to a problem with the title.  JA 487.  Navas and Edgar

believed that they should have been credited $20,000, the value of the car.  She

said, "[W]e gave him the car to him.  So it was their problem, you know.  Not our

problem anymore . . . Napo told me to give it to Nery."  JA 428.

In June 2005, federal law enforcement authorities arrested Edgar and Navas

in Maryland.  Approximately two kilograms of cocaine was seized from them.  JA

430.  Navas owed Napo $36,000 for those two kilograms.  JA 425.  Two days after

her arrest, Navas began to cooperate.  JA 430.  As part of that cooperation, Navas

made several telephone calls.  JA 434.  Before Navas began making phone calls,

however, Villagran left a threatening message on Navas's phone for Edgar.  This

message was preserved and played for the jury.  JA 432.  In the message, Napo

demanded to see Edgar and explained "that things were going to get different from

now on."  JA 432.

Under law enforcement direction, Navas made and recorded several calls to

Diego in Guatemala to discuss money that she and Edgar owed to Villagran for

drugs he had sent to them to sell.  In one call, she advised Diego that she had

$7,000 for Villagran towards her debt, and needed instructions on how to send the money to Villagran. JA 440-48. She was directed to send money through Fito Express. JA 447-48. On two different occasions, and under law enforcement supervision, Navas delivered $7,000 and $6,500 in cash to Fito for the purpose of repaying her debt. She introduced undercover officers in the process, as well. JA 451, 652. After she delivered the $7,000 payment to Fito, Navas called Diego and asked whether the payment made it to Villagran. Diego did not know, and told Navas that she could find out if the money had made it to Villagran by talking to Nery, the defendant. JA 449, 452. Based on that information, Navas called the defendant.

Two recorded conversations between Navas and the defendant were admitted into evidence. JA 453-60. Navas identified the defendant's voice in both calls. JA 453, 458. They discussed the Mercedes-Benz that the police seized from Nery and whether Villagran would give Navas and Edgar credit for the money represented by the car. JA 455. They also discussed the $7,000 recently sent through Fito Express to Villagran. JA 457. When Navas told the defendant she was working on paying off the debt, Duarte told her, ". . . don't worry, I will talk to him." JA 458. Navas understood "him" to mean Villagran. In the second call to the defendant, Navas said she was "working again with the same stuff," *i.e.*,

selling drugs in order to pay the debt. The defendant said he would send her "something," which Navas understand to mean he would send her more drugs to sell. JA 459-60.[2] Specifically, in coded language, the defendant told Navas that he was going to send her 1.5 kilograms of cocaine to sell. JA 460-61.

### D.    Expert Testimony

The government's last witness, IRS Special Agent William DeSantis, testified as an expert and described the concept of money laundering. Agent DeSantis explained how money laundering is accomplished, and why it is often necessary to criminal organizations. JA 553-73.

### E.    Verdict

The evidence showed that the defendant was a trusted member of the Villagran drug organization from at least 2003 through 2006. Duarte was instrumental in moving money from the United States to Guatemala, and knew this money was drug money. The jury agreed.

---

[2]   An additional $620,000 in cash was delivered by undercover agents to Fito Express, ostensibly as drug money, and was delivered by Fito's couriers to DEA agents posing as drug dealers in Guatemala to whom the money was purportedly owed. This was part of the undercover sting against Fito Express was made possible through the cooperation of Navas. JA 674-77.

## SUMMARY OF ARGUMENT

The defendant alleges numerous errors by the district court in connection with its evidentiary rulings.  First, even though he did not object below, Duarte alleges that the district court committed error in admitting tape recordings a cooperating witness, Marilyn Navas, made to Walter "Diego" Paredes, and the defendant, Nery Duarte.  These recordings contained coconspirator statements made by Diego and Duarte as defined in Fed. R. Evid. 801(d)(2)(E); Duarte's statements were also admissible as an opposing party's statement pursuant to Fed. R. Evid. 801(d)(2)(A); and Navas' statements were admissible because they were not hearsay.  These calls were properly admitted.

Second, the defendant alleges that the district court erred in allowing the expert testimony of Special Agent DeSantis as to money laundering.  Contrary to the defendant's assertions, Agent DeSantis was qualified to testify as an expert, and his testimony was helpful to the jury.  Agent DeSantis was an experienced law enforcement officer, having served as a border patrol agent in California, a criminal investigator with the IRS, and a Special Agent with the IRS.  Further, he was a member of the Association of Certified Anti-Money Laundering Specialists, which is an organization of expert witnesses within the IRS.  He also served as an instructor on money laundering and drug interdiction on the highways.  The fact

14

that he had not published any papers or been qualified as an expert in court prior to the date of his testimony in this case did not defeat his qualifications to be accepted as an expert.  Indeed, Agent DeSantis's testimony as to how money laundering works was extremely helpful to the jury in this case, as this prosecution involved an international drug and money laundering operation that used multiple methods to assure the safe return of drug proceeds to Guatemala.

Third, the defendant alleges that the district court erred in restricting his cross-examination as to two government witnesses, Raul Sandoval and Marilyn Navas.  The district court did not err.  As to Sandoval, the court prevented Duarte from misleading the jury, as Sandoval pled guilty to the same conspiracy charges in this case in Washington, D.C., and therefore did not receive immunity for his crimes.  As to Navas, the district court simply stopped the defendant from delving into the particular details of the potential sentences, where the benefit Navas received for her cooperation was already clear.

The last evidentiary matter alleged to have been in error was the district court's admission of the defendant's nickname, "El Diablo."  This was a reference used by Navas in the tape recording between Navas and the defendant.  Use of the nickname was necessary to establish the defendant's identity, *i.e.*, to whom Navas was speaking on the phone.  As there was clearly a legitimate purpose for the use

15

of the defendant's nickname, the district court did not commit plain error (or abuse its discretion) in admitting the reference to the defendant's nickname.

The defendant claims that these "errors" so infected the trial that the "cumulative error" doctrine requires reversal of his convictions.  There were no errors, so the Court need not reach this issue.  However, if there were any errors, such errors were harmless, and plainly were not prejudicial enough to have "fatally infected [the defendant's] trial." *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004.  Accordingly, the cumulative error doctrine is inapplicable.

Finally, Duarte argues that the district court clearly erred in determining that the approximately $1.1 million seized by law enforcement from the vehicle that he drove should be converted into a drug quantity for sentencing purposes.  Based on the testimony of the price of a kilogram of cocaine, the district court determined that 63 kilograms of cocaine were attributable to the defendant.  This clearly was appropriate, as a defendant need not know the type or quantity of contraband.  The harm to society is reflected by the amount seized.  In this case, 63 kilograms of cocaine was a very conservative estimate.

# ARGUMENT

I. **THE DISTRICT COURT PROPERLY ADMITTED TELEPHONE RECORDINGS MADE WHILE THE DEFENDANT WAS A MEMBER OF THE ONGOING CONSPIRACY AS CO-CONSPIRATOR STATEMENTS UNDER FED. R. EVID. 801(d)(2)(E).**

A. **Standard of Review**

A trial court's evidentiary decisions are normally evaluated for abuse of discretion. Where the defendant fails to make a timely, contemporaneous objection to the introduction of evidence, however, review is only for plain error. *United States v. Pratt*, 239 F.3d 640, 644 (4th Cir. 2001) (evaluating admission of statements pursuant to Fed. R. Evid. 801(d)(2)(E) only for plain error).

On plain error review, "it is the defendant rather than the Government who bears the burden of persuasion." *United States v. Baptiste*, 596 F.3d 214, 220 (4th Cir. 2010) (internal citation omitted) (quoting *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998)). "[A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus,* 560 U.S. 258, 262 (2010). With

17

regard to the fourth prong of the plain error test, an appellate court "should not notice a forfeited error under Rule 52(b) unless a miscarriage of justice would result." *United States v. Cedelle*, 89 F.3d 181, 184 (4th Cir. 1996).  "Plain error review is 'strictly circumscribed' and '[m]eeting all four prongs is difficult, as it should be.'" *United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011) (quoting *Puckett v. United States*, 556 U.S. 129, 134, 135 (2009)).

## B.    Additional Facts

As described above, the evidence in this case included the testimony of a cooperating witness, Marilyn Navas.  Navas began to cooperate with law enforcement authorities just after her arrest in June 2005.  JA 430.  At the time of her arrest, her boyfriend, Edgar, owed Villagran either $55,000 or $75,000, depending on whether Villagran credited the $20,000 Mercedes-Benz that never made it to Guatemala.  JA 424-28.  Because of her arrest and the seizure of two kilograms of cocaine, Navas owed Villagran $36,000.  JA 425.

As part of her cooperation, Navas made recorded telephone calls to various lieutenants of Villagran's, ostensibly to determine the exact amount that she owed. She called three men:  Walter "Diego" Paredes; Walter Velasquez; and the defendant, Nery Duarte.  JA 440-60.  During these calls – particularly those with the defendant – the conversations not only corroborated Navas's testimony, but

18

also established that these men worked at Villagran's behest.  Indeed, these

conversations confirmed the existence of an ongoing conspiracy of which the

defendant, Villagran, and the others, were still very much a part.

When the government introduced the transcripts of these conversations

through the certified translator, the defense voiced no objection.  JA 324.  Because

the conversations were in Spanish, the transcripts were the actual evidence.  JA

438-39; *United States v. Borda*, 178 F.3d 1286, 1999 WL 29450 (4th Cir. 1999).

When the government began using the transcripts with Navas on the witness stand,

the defense objected, but only to the format of the transcripts.  JA 434.  The

complaint was that the transcripts did not include the Spanish and English words,

only the latter.  That objection was overruled.  JA 438.  Halfway through the

reading of the first call, which was between Navas and Diego, defense counsel

objected to these conversations, stating, "[T]his is a call made after the conspiracy

is over for purposes of the witness and it's being introduced through 801(d)(2)(E).

So I object to the introduction."  JA 441.  The district court overruled the

objection.[3]

---

[3]  The defendant claims to have objected earlier in the trial prior to the admission of
these calls.  Def. Br. 34.  But that objection, at JA 420, was related to unrecorded
conversations that Navas had made *prior* to becoming a cooperator.  Even if this
objection related to the recorded calls, it was still too late because the calls had
already been admitted through the testimony of the certified translator.

19

### C. Analysis

#### 1. The Defendant's Argument

Duarte alleges that the district court erred when it permitted the admission of recorded telephone calls – actually the transcripts – during Navas's direct testimony.  At the outset, the government repeats that the defendant did not object when they were admitted, only when the government began to use them later in the trial with witness Navas.  But as to the defendant's argument, as the government understands his complaint, it is in two parts.  The defendant objects (1) to the admission of the words spoken by co-conspirator Diego when he was speaking with Navas; and (2) to the admission of the words spoken by Navas when she was speaking with Diego and with defendant Duarte.  Initially, the government notes that Duarte's words as he spoke with Navas were admissible as an opposing party's statement pursuant to Fed. R. Evid. 801(d)(2)(A).  The defendant conceded this point.  Def. Br. 38.

#### 2. Diego's Words

Specifically, Duarte alleges that because Navas was no longer a member of the conspiracy at the time she made these calls, and was in fact a cooperator, *i.e.*, a government agent, these calls could not be co-conspirator statements made during and in furtherance of the conspiracy.  Def. Br. 34-39.  This argument is correct as

20

to *Navas's* statements, but not to *Diego's*.   At the time the calls were made, Diego and Duarte were both still very much members of an ongoing conspiracy.   *United States v. Pratt*, 239 F.3d 640 (4th Cir. 2001), makes this point.  In *Pratt*, the defendant (Pratt) and his co-defendant, Strachan, were arrested with fifteen kilograms of cocaine.  Both men began to cooperate immediately and both made recorded telephone calls to a man named Brannon, the intended recipient of the drugs.  A controlled delivery was set up.  Pratt and Strachan went with the DEA to deliver the drugs to Brannon.  Prior to the delivery, however, Pratt decided he no longer wished to cooperate.  At Pratt's trial, the government played the recorded calls between Strachan and Brannon.

At trial, Pratt challenged the admission of these recorded statements as inadmissible hearsay primarily because Strachan was no longer a member of the conspiracy at the time these calls were made.  This Court observed that "this argument fails because, even assuming Strachan had withdrawn from the conspiracy, Brannon's statements would still be admissible against Pratt, *unless Pratt too had withdrawn from the conspiracy at the time of the conversation.*"  239 F.3d at 644 n.1 (emphasis added).

On appeal, Pratt raised a different claim, challenging the admission of these statements on the theory that Pratt himself was no longer a member of the

21

conspiracy at the time the calls were made.  This Court agreed that the district court had "probably" erred (while finding the error harmless), *id.* at 644, because Pratt had in fact withdrawn from the conspiracy when the calls were placed.  But the instant case is entirely different.  Here, Duarte had *not* withdrawn from the conspiracy at the time Navas made the calls to his co-conspirators (and to him). Thus, Diego's statements (as well as Duarte's) were perfectly admissible. The defendant's attempt to extrapolate the logic of *Pratt* to the facts of this case must fail.

In *United States v. Urrego-Linares*, 879 F.2d 1234 (4th Cir. 1989), also cited by the defendant, two conspirators, Urrego and Restrepo, were arrested with four kilograms of cocaine.  Restrepo immediately began to cooperate and called the intended recipient of the cocaine, Rivera.  The delivery was made and Rivera, too, was arrested.  At Urrego's trial, Restrepo testified to the substance of these telephone calls.  The trial court determined that these conversations were admissible pursuant to Fed. R. Evid. 801(d)(2)(E).  This Court affirmed, holding that "[t]he fact that Urrego and one of his co-conspirators were arrested did not necessarily mean that the conspiracy was terminated."  *Id*. at 1240.  Simply put, the arrest of Urrego, the defendant at trial, did not result in his withdrawal from the

conspiracy, which was still ongoing at the time of the calls. The calls between Restrepo and Rivera were admissible as co-conspirator hearsay statements.

The present case is similar to *Urrego-Linares*, and unlike *Pratt*. Here, as in *Urrego-Linares*, a cooperator (Navas) testified against a defendant (Duarte) who had never withdrawn from the conspiracy. In *Pratt*, the cooperator was testifying against a defendant who *had* withdrawn from the conspiracy at the time the consensual calls were made. Accordingly, there was no error in this case in the district court's admission of Diego's statements.

### 3.    Navas's Words

Finally, the defendant claims that even if Duarte's and Diego's words were admissible, the court should have ordered the calls dissected to remove Navas's part of the conversation. The defendant asserts he would have then been able to rely on the nonsensical portions that remained. There is no merit to this argument. Navas's words – her half of these conversations – were not hearsay. As this Court recently explained,

> Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed.R.Evid. 801(c). A "statement" is an oral or written assertion, Fed.R.Evid. 801(a), and "the matter asserted" is "the fact being asserted by the declarant in uttering the statement," *United States v. Lewis,* 594 F.3d 1270, 1282 (10th Cir. 2010). In order to determine whether

23

> an out-of-court statement qualifies as inadmissible hearsay under this Rule, the district court must "identify[ ] the actual purpose for which a party is introducing" the statement at issue. *United States v. Gonzales-Flores*, 701 F.3d 112, 117 (4th Cir. 2012). A statement is not hearsay if it is offered for some purpose other than to prove the truth of the assertion contained within the statement.

*United States v. Edelen,* ___Fed.Appx.____, 2014 WL 961565, *7 (4th Cir. 2014)(unpub.). Navas's *live* testimony was not hearsay, of course, and was offered as the truth. And her pre-recorded conversations with both the defendant and Diego were also not hearsay because they were *not* offered for the truth. Her portions of those conversations were offered only for the effect her statements had on the listener. *Pratt*, 239 F.3d at 643-44; *United States v. Safari*, 849 F.2d 891, 894 (4th Cir. 1988); *United States v. Guerrero-Damian,* 241 Fed.Appx. 171, 173, 2007 WL 2326818 (4th Cir. 2007)(unpub.). Navas's words gave context to the statements made by Diego and Duarte. If the defendant had sought a limiting instruction on the distinction, he would have been entitled to it. *Edelen*, 2014 WL 961565, at *8.

For all of these reasons, there was no error in the district court's decision to admit these conversations in full. If there was error, any such error was harmless (and certainly was not plain), in light of the overwhelming evidence of Duarte's guilt separate and apart from the phone calls. There was no miscarriage of justice here. The defendant's claim should be rejected.

24

## II.   THE DISTRICT COURT PROPERLY ADMITTED THE TESTIMONY OF THE GOVERNMENT'S MONEY LAUNDERING EXPERT PURSUANT TO FED. R. EVID. 702.

### A.   Standard of Review

"The trial judge has broad discretion under [Fed. R. Evid.] Rule 702." *United States v. Gastiaburo*, 16 F.3d 582, 589 (4th Cir. 1994) (citing *Hamling v.United States*, 418 U.S. 87 (1974)). This Court will review the admission of expert testimony only for an abuse of discretion. *United States v. Safari*, 849 F.2d 891, 895 (4th Cir. 1988).

### B.   Additional Facts

The government called William DeSantis, an Internal Revenue Service special agent, as an expert in money laundering. Prior to trial, the government provided the appropriate notice, JA 7, Docket Entry 62, and the defendant lodged no objection. At trial, Special Agent DeSantis described his background and training, including his experiences as a border patrol agent in California, as a criminal investigator with the IRS, and as a special agent with the IRS. JA 542-44. DeSantis also described both his membership in the Association of Certified Anti-Money Laundering Specialists, which is an organization of expert witnesses within the IRS, and his role as an instructor on money laundering and drug interdiction on the highways. JA 544-45. DeSantis explained that he worked

25

closely with the Drug Enforcement Administration in ongoing investigations, and his role has been "to support the investigation by conducting financial investigations regarding the movement of money, the spending of money, [and] the general use of the money by these criminal organizations, in an attempt to disrupt their organization."  JA 546.

Defense counsel conducted a *voir dire* of DeSantis's credentials.  JA 546-52. Following this cross-examination, defense counsel stated, "I don't believe the testimony is relevant or helpful to the jury.  Beyond that . . . he's never been qualified as an expert before."  JA 552.  The court, however, found that DeSantis was sufficiently qualified to be an expert, and accepted him as an expert in money laundering.  *Id.*

The government then questioned Special Agent DeSantis about what the term "money laundering" means, how it is accomplished, and why it is necessary to criminal organizations.  JA 553-73.  DeSantis's testimony then touched on a number of topics, including the inherent potential for lost profit in drug operations (JA 554-55); the use of front businesses to conceal illegal cash (JA 556-57); the use of bank accounts to funnel cash across the country and beyond (JA 557-60); certain bank reporting requirements (JA 559); the use of money service businesses that wire cash or use couriers (JA 560-61); trade-based money laundering (JA 561-

64); the use of concealed compartments (JA 564); bulk cash smuggling (JA 567-70); how drug organizations mitigate the risk of loss by their couriers (JA 570-71); and the operation of interdiction squads on the highways trained to identify characteristics of vehicles carrying contraband (JA 573).

### C.    Analysis

The defendant's chief complaint is that Special Agent DeSantis was not qualified to testify as an expert, and that his testimony was not helpful to the jury. This is the same objection made at trial and denied by the district court. Specifically, Duarte alleges that "nothing [DeSantis] testified about was beyond the ken of the average juror . . . and his credentials were simply of the garden-variety law-enforcement variety."  Def. Br. 40.   The defendant also alleges that DeSantis did not testify as an "expert," but rather was improperly allowed to testify as a summary witness.  These arguments are without merit.

### 1.    The Testimony was Helpful.

This Court has long recognized that experts are permitted to "testify regarding those aspects of narcotics transactions that are unlikely to be within the knowledge of the average layman."  *United States v. Pugliese*, 712 F.2d 1574, 1582 (2d Cir. 1983); *see also Safari*, 849 F.2d at 895 (favorably citing *Pugliese*). This case was not about a few street dealers selling drugs on a corner.  Even if it

were, experts in drug cases are often called upon to discuss coded language or extrapolate amounts of drugs based upon the purity of drug seizures. *See United States v. Gastiaburo*, 16 F.3d 582, 587 (4th Cir. 1984) (expert could testify whether the amount possessed was for personal use or distribution); *United States v. Villarreal*, 185 Fed. Appx. 260, 2006 WL 1667444, *1 (4th Cir. 2006) (unpub.) ("[T]he manner in which drug dealers record transactions is not a fact commonly known to a jury."); *Pugliese*, 712 F.2d at 1581 (expert could describe the characteristics of an addict). This prosecution was about an international drug and money laundering operation that used multiple methods to assure the safe return of drug proceeds to Guatemala. Money laundering on the scale described in this case can be an extremely confusing and complex concept for most lay persons. "[W]hen the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining to the jury, the testimony may be admitted." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011).

The district court's finding that this testimony would be helpful to the jury was certainly not an abuse of discretion.

2.    Special Agent DeSantis was Qualified to Testify as an Expert.

The background, training, and experience of Special Agent DeSantis were more than adequate to qualify him as an expert. He described 17 years in law

28

enforcement as both a border patrol agent and with the IRS.  JA 542-44.

Moreover, at the time he testified, DeSantis was a member in a cadre of Certified

Anti-Money Laundering Specialists, an organization of expert witnesses within the

IRS.  Finally, he had been an instructor on money laundering and drug interdiction

on the highways.  JA 544-45.  The defendant nonetheless complained that

DeSantis was not qualified to be an expert because he had never been published or

been qualified as an expert prior to this trial.  Def. Br. 34-39.  There has to be a

first time that an expert testifies, and for Special Agent DeSantis, this was it.

There is no requirement that an expert witness have academic publications before

being able to express an opinion about a matter within his area of expertise.

DeSantis's credentials were more than adequate to qualify him for the task.

There was no abuse of discretion by the district court in accepting this

witness as an expert.

### 3.    Special Agent DeSantis's Testimony Was Proper.

Finally, the defendant complains that Special Agent DeSantis "opined as an

'expert' on every fact the government intended to adduce as evidence in this trial...

and became a 'summary witness' for the government, allowing the government to

summarize its evidence through his mouth and thus bolster an otherwise weak

government case."  Def. Br. 40-41.  This is simply untrue.

First and foremost, the government's evidence against Duarte was overwhelming. In 2003, the defendant was caught with more than $1 million *in cash* having just left the company of a notorious Guatemalan drug lord, Villagran. In 2004, the defendant was collecting money and accepting cars in Connecticut as payment to Villagran for drugs. During that time, Duarte called Sandoval and delivered a threatening message on Villagran's behalf. In 2006, Duarte was negotiating a debt owed to Villagran by Navas and offered her more drugs to sell. The evidence of the defendant's guilt presented at trial, which supports the jury's verdict, is overwhelming.

More to the point, however, Agent DeSantis never discussed any of the actual evidence at trial. While it would have been perfectly proper for him to answer hypothetical questions tailored to the facts of this case, the government did not ask him to do even that. *United States v. Mann*, 712 F.2d 941 (4th Cir. 1983). Agent DeSantis did not discuss the defendant, any of the co-conspirators, or any of the actual evidence against the defendant that reflected trade-based money laundering, bulk cash smuggling through hidden vehicle compartments, use of money service business couriers, and/or funneling dirty money through banks. Instead, he merely explained what money laundering is and how it is generally

30

accomplished by drug organizations across the United States and beyond. Agent DeSantis did not opine on the defendant's conduct or intent.

Agent DeSantis' testimony focused on "objectively established conduct [which] constituted . . . element[s] of money laundering." *United States v. Barber*, 80 F.3d 964, 970-71 (4th Cir. 1996). That is the role of an expert. In *United States v. Barnett*, 63 Fed. Appx 643, 2003 WL 1861569, *2 (4th Cir. 2003) (unpub.), the defendant complained that the expert in that case improperly bolstered a fact witness. Disagreeing, this Court ruled that "the government properly compared [the fact witness's] and [the expert witness's] testimony, as corroboration." *Id*. That is precisely what was done in this case.

At the heart of the defendant's complaint is that this international drug organization operated much like many other drug organizations – using the same methods to launder money that Agent DeSantis has studied, investigated, taught, and was able to describe. To use the defendant's words, it was a "garden-variety" international drug organization. By describing money laundering in general, and the methods of accomplishing money laundering in particular, the jury was able to understand the true criminal nature of the conduct of this conspiracy revealed by the witnesses who did describe the facts. Agent DeSantis's testimony was

31

relevant.  It was helpful.  That this testimony was probative to its case is precisely why the government presented it.

## III. THE DISTRICT COURT PROPERLY SUPERVISED THE CONDUCT OF THE COURTROOM AND DID NOT LIMIT VALID CROSS-EXAMINATION OF COOPERATING WITNESSES.

### A. Standard of Review

This Court will review a district court's decision to limit cross-examination of a government witness for an abuse of discretion.  *United States v. Smith*, 451 F.3d 209, 220 (4th Cir. 2006).  "An improper denial of an opportunity to examine a witness for bias is subject to harmless error review."  *United States v. Shelton*, 200 Fed. Appx. 219, 2006 WL 2640254 (4th Cir. 2006) (unpub.).

### B. Analysis

This Court has addressed this issue many times.  The analysis begins with recognition of the general rule:

> The Supreme Court has stated that a defendant's right to cross-examine cooperating witnesses about sources of potential bias is guaranteed by the Confrontation Clause of the Constitution . . . . However, the Court also made clear that trial courts retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

*United States v. Cropp*, 127 F.3d 354, 358 (4th Cir. 1997) (internal citations omitted). It is "the witness' expectations, rather than the actual sentence eventually given," that is the potential source of a witness' possible bias. *Id*. Each relevant case requires a determination of what happened during the defendant's cross-examination of the government's witnesses, and whether the limits imposed on that cross-examination by the trial court were "reasonable." On review, this Court will determine "whether the jury possesse[d] sufficient evidence to enable it to make a 'discriminating appraisal' of bias and incentives to lie on the part of the witnesses." *Id*.

      1.   <u>Raul Sandoval</u>

Sandoval testified about the agreement he had with the government. JA 338. Sandoval was actually prosecuted in the District of Columbia and his agreement with the government, dated April 2007, was admitted into evidence. *Id*. The underlying facts of the case for which he was convicted in D.C. included his working with Martin Guerra and Villagran between 2002 and 2007. JA 367-69. In his testimony, Sandoval described how he obtained kilograms of cocaine from Villagran, and returned drug proceeds through Fito Express or by bank deposits. Without question, he was part and parcel of the same conspiracy as the defendant in this case.

When Sandoval testified in the District of Maryland on December 6, 2012, he had completed his sentence of 42 months' incarceration.  JA 374.  However, he was still in jail on an immigration detainer, pending deportation.  JA 340; JA 373-79.  Sandoval advised that his cooperation agreement was for a "sentence reduction" that he had already received.  Sandoval believed he was nevertheless still obliged "to be here to tell the truth because that is what I agreed to in the agreement."  JA 340.  Sandoval also hoped to get an immigration benefit – to avoid deportation back to Guatemala – but agreed that this had not been promised.  *Id.*

On cross-examination, Sandoval confirmed that he was charged with conspiracy to distribute in excess of five kilograms of cocaine and that he faced a ten-year minimum mandatory sentence of incarceration, and up to a maximum of life imprisonment.  JA 368.  Duarte's counsel reviewed the benefits and promises made to Sandoval as described above.  The cross-examination then proceeded as follows:

| | |
|---|---|
| Counsel: | Did they promise not to charge you in this case? |
| Sandoval: | No, they didn't promise, but they know my history, and if I lie, if I didn't tell the truth, I could be charged. |
| Counsel: | So, in fact, you're getting immunity for . . . you're not getting charged. |
| AUSA: | Objection Your Honor. |

34

| | |
|---|---|
| Court: | Yes.  Sustain the objection to any talk about immunity.  All right. |
| Counsel: | So you're not getting charged in this case for what you just told the jury that you did in connection with Napo and all these other people that you identified?  You're not getting charged in this case? |
| Sandoval: | I already paid for that in Washington. |
| Counsel: | That's a different case number. |
| AUSA: | Objection, Your Honor.  This witness is not about cases and conspiracies. |
| Court: | Yes.  Sustain the objection to that, counsel. |

JA 383-84.  Defense counsel then advised the district court that she was going to

review the indictment forming the basis of Sandoval's D.C. conviction "to see if it

was a separate indictment."  JA 384.  The district court replied, "Well, you can do

that.  That's fine.  If you need to bring him back, he can be brought back."

Counsel said, "Okay."  JA 384.  Needless to say, the topic was never discussed

again – because the charges faced by Sandoval in D.C. and to which he admitted

his guilt was the same conspiracy charged in this case.

This testimony is the sole basis upon which the defendant now complains

that the trial court improperly restricted his right to cross-examine Sandoval.

With Sandoval's testimony, the jury heard the minimum and maximum

penalty he had been facing.  JA 368.  The jury knew he served 42 months in

prison.  JA 374.  The jury knew he was in custody pending deportation.  Finally, the jury knew that he hoped that, through his testimony, the government would let him stay in the United States, but no promises had been made.  JA 379.  There were no other benefits, real or potential, provided or to be provided to Sandoval.  There was nothing left for the defendant to explore.  The purpose of cross-examination – to expose the witness's motive to lie – was accomplished.

Despite counsel's attempt to manufacture additional benefits to Sandoval, none existed.  Her cross-examination of Sandoval was improper, and the district court was correct to put a stop to it.  JA 383-84.  Sandoval pled guilty in the District of Columbia to the very same drug conspiracy in which Duarte was a member.  Sandoval said it quite clearly: he "paid" for being involved in the very same drug conspiracy through his conviction in Washington, D.C.  JA 383-84.  Defense counsel's attempt to suggest that because the case had a different case number meant it was a different conspiracy was misleading.  To then suggest that Sandoval had gained immunity from a second prosecution in Maryland was equally misleading.  The Supreme Court has said, "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  There was no error here.

2.    <u>Marilyn Navas</u>

Marilyn Navas also answered questions about her agreement with the government.  She testified that when she was arrested in June 2005, the government secured a work permit so that she could legally work in the United States, promised that she would not be deported, and did not charge her.  JA 431.  In return she was expected to tell the truth, make phone calls, and work with law enforcement.  *Id*.  The jury also learned that members of Navas's family were airlifted out of Guatemala by the government for their safety.  JA 466, 659.

On cross-examination, Navas was questioned about the immigration benefits she received for working with the government, as well as the benefits to members of her family.  JA 463-67.  Defense counsel then questioned Navas as follows:

Counsel:    Now do you know what the penalty for this conspiracy –

AUSA:    Objection.

Court:    Yes.  Sustain the objection to penalty.

Counsel:    If she had been charged.

Court:    Sustain an objection to penalty.  It's a matter for the judge's [*sic*].  Next  question.

Counsel:    You understand that if you had been charged in this case, you would be facing a felony conviction.  Right?

AUSA:    Objection, Your Honor.

| Court: | Yes.  Sustain the objection. |
|--------|------------------------------|
| Counsel: | Your Honor, that's a benefit she received. |
| Court: | Counsel, again the specifics of penalties and so forth, I'm going to go ahead and sustain that. |
| Counsel: | You understand that by not being charged here, you avoid getting a conviction? |
| Navas: | Yes. |
| Counsel: | Right.  And it's a serious case? |
| Navas: | Yes. |
| Counsel: | So that's a great benefit to you? |
| Navas: | Yes. |

JA 534-35.  Defense counsel then went on to another topic.  This testimony is the basis for the defendant's complaint that he was denied his constitutional right of confrontation by the district court's limitation on his cross-examination of Navas. Def. Br. 42-45.

Navas clearly testified about the benefits she had received.  She was not charged for her role in this conspiracy. She was permitted to stay in the United States, and was provided a work permit.  Finally, Navas's family was airlifted out of Guatemala due to the perceived danger that they faced because of her cooperation and/or the debt she owed to Villagran.  That the defense was not

38

permitted to cross-examine her on the penalties she avoided is of no moment.  The

jury knew from Sandoval's testimony that a conviction carried a potential ten-year

mandatory minimum sentence and a maximum sentence of life imprisonment.

More realistically, they knew that Sandoval had served 42 months' incarceration.

The benefits to Navas – no prosecution and a life in the United States – were all the

jury really needed to know.  "Restricting counsel from delving into the particular

details of the potential sentences [a witness] could have, but did not necessarily

face was an appropriate discretionary limitation . . . ," so long as defense counsel is

able to demonstrate that the "witness had a motive for testifying . . . " *United*

*States v. Shelton*, 200 Fed.Appx. 219, 2006 WL 2640254 *1 (4th Cir. 2006)

(unpub.).  Here, Duarte's counsel was given that opportunity.  It cannot be said that

the limits placed upon cross-examination by the district court in this case were an

abuse of discretion.

## IV.  THE DISTRICT COURT PROPERLY PERMITTED TESTIMONY ABOUT THE DEFENDANT'S NICKNAME AS EVIDENCE OF HIS IDENTIFICATION.

### A.    Standard of Review

This Court reviews a district court's decision to admit contested evidence for

abuse of discretion.  *United States v. Hassan El,* 5 F.3d 726, 731 (4th Cir. 1993).

With respect to the admission of uncontested evidence, the decision of the district

court is reviewed only for plain error. *United States v. Brewer*, 1 F.3d 1430, 1434 (4th Cir. 1993).

### B.    Additional Facts

The defendant was indicted as "Nery Gustavo Ramos Duarte, also known as 'El Diablo.'"  JA 19.  Defense counsel filed a Motion to Strike Alias on October 29, 2012, four days prior to the motions hearing in this case.  JA 9 (Dkt. 71, 74). That motion requested the district court to strike the alias from the indictment as surplusage.  The justification was that there was not going to be any evidence produced at trial to show that the defendant "used or was known by the aliases [*sic*] contained in the Indictment."  The defendant also argued that because the translation of "El Diablo" was "the Devil," mention of the alias was unduly prejudicial.  Finally, the defendant argued that if the alias was printed in any of the transcripts, it should be stricken.  The district court denied this motion, among others, at that hearing on November 2, 2012.  JA 9 (Dkt. 74).

During the trial testimony of Marilyn Navas, a portion of both recorded telephone conversations she had with the defendant were played for the jury.  JA 353, 458.  The government played the calls, even though the English transcripts were the evidence, so that the defendant's voice was heard by the witness.  After the brief portion of each call, Navas identified the speaker as the defendant,

"Nery." *Id*. The defendant did not identify himself in any fashion. Following Navas's identification of the speaker as the defendant, the government began the process of reading the English transcripts. The second call between Navas and the defendant began as follows:

| | |
|---|---|
| Duarte: | Hello? |
| Navas: | Hello. |
| Duarte: | Yes. |
| Navas: | Hello Mister . . . uh Diablo. |
| Duarte: | How are you doing over there, girl? |

The government then interrupted Navas and asked, "What did you call this person?" Navas responded, "Diablo." Government counsel then asked, "Is that a nickname?" Navas replied, "Yes." JA 459. There was no objection from defense counsel. The government then continued the reading of the transcript. After several passages, government counsel stopped reading the transcript and interposed specific questions. This process was followed for all of the calls admitted at trial. No one was asked to translate the meaning of the word "Diablo," and no other reference was made to it. Having the jury understand that this person Navas called "Diablo" on the recorded call was the defendant was the only point being made.

41

Again, the defendant made no objection before, during, or after the reading of this transcript.  Moreover, Duarte had this transcript in its final form well before trial.

## C.    Analysis

It is permissible for the government to introduce evidence of a nickname when it is relevant to the identification of the defendant.  *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1975).  This Court noted in that event, "the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted."  *Id*.  Here, the district court properly denied the motion to strike.  On appeal, the defendant challenges the evidentiary value of this testimony, and assigns nefarious motives to the government for seeking its admission.  Def. Br. 45-46.

The defendant complains that no other witness identified the defendant by that nickname.  But Navas was the only government witness that personally knew this defendant.  The other cooperating witness, Sandoval, testified that he had received a call from someone identifying themselves as "Nery" on behalf of drug lord Villagran.  Sandoval, however, testified that he did not know who that person was.  JA 356-58.  Other than the defense witnesses, who were not asked, there were no witnesses at trial, other than Navas, who would have known the defendant's nickname.

42

In *Clark*, cited above, the trial court had also denied a pre-trial motion to strike a nickname.   On review – in contrast to this case – this Court determined that there was no legitimate purpose for the use of the alias and observed that if defendant Clark has renewed his motion to strike, the trial court should have granted the motion.  Critical to the analysis, however, was the fact that the defendant failed to renew the motion following the specific testimony.  As this Court observed,

> Although the existence of an alias was proven, it apparently served no purpose in the prosecution's proof and bore no direct relationship to any of the acts charged. Had the defense renewed its motion to strike during trial, it should have been granted.  However, Clark failed to renew his motion to strike and there has been no showing that the use of the alias was prejudicial to the defendant.  Under these circumstances the use of the alias was not error.

*Clark*, 541 F.2d at 1018.

Here, there was no renewed objection.  Moreover, there has been no showing of prejudice.  Unsupported accusations of ill-motive by the government in the defendant's brief do not amount to a showing of prejudice.  The name "Diablo" was mentioned once in connection with identifying to whom Navas was speaking. There was no error here.

# V.    ASSUMING *ARGUENDO* THAT THERE WAS ERROR, THE CUMULATIVE ERROR DOCTRINE DOES NOT REQUIRE REVERSAL OF THE DEFENDANT'S CONVICTIONS.

## A.    Standard of Review

In order to reverse a conviction based on the cumulative error doctrine, the "errors must 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004).  "When 'none of [the] individual rulings work[ ] any cognizable harm, ... [i]t necessarily follows that the cumulative error doctrine finds no foothold.'" *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (citation omitted).

## B.    Analysis

As this Court recently explained, "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Hager*, 721 F.3d 167, 204 (4th Cir. 2013) (citations omitted).

In applying this standard, this Court was mindful of the requirement set forth in *Basham*, 561 F.3d at 330, in which the Court recognized that in order "[t]o satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness."  Therefore, the Court in *Hager* ruled that the harmless errors "were not widespread or prejudicial enough to have fatally

44

infected [the defendant's] trial or sentencing hearing. The proceeding below adhered to fundamental fairness. There is overwhelming evidence of guilt in the record and any possible error did not play a role in the outcome of either phase of [the] trial."

The government submits that there were no errors in this trial. However, if there were errors, the cumulative effect of any errors did not "fatally infect" the trial, as alleged by the defendant.

Generally, if a court "determine[s] ... that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007).

Specifically, the defendant claims that the alleged errors – admitting the phone calls between Marilyn Navas and the defendant, allowing the expert testimony of Agent DeSantis, allowing a fleeting reference to "Diablo" (the defendant's nickname), and allowing further cross-examination of Navas and Sandoval – require application of the cumulative error doctrine, suggesting that the jury could have accepted that Duarte was an innocent purchaser of a truck in which approximately $1.1 million was stored.

45

That is simply not the case. The fact that a drug distributor would allow someone unconnected to the conspiracy to drive off in a vehicle with approximately $1.1 million defies common sense. Additionally, the defendant had continued dealings with Villagran, who was present in Chicago when the defendant got the truck, throughout the time period alleged in the indictment. Navas and Sandoval distributed drugs they received from Villagran in the United States, and sent money back through the defendant, Fito, and others as payment for the narcotics. Therefore, even if the district court committed error in allowing certain recorded calls, the reference to Diablo, expert testimony, and wrongfully curtailed broader cross-examination of the cooperating witnesses, the proceeding below was fundamentally fair, and the evidence of the defendant's guilt was overwhelming.

Therefore, the United States respectfully requests that this Court rule that the cumulative error doctrine is inapplicable to this case.

## VI. THERE WAS SUFFICIENT EVIDENCE TO SUSTAIN THE JURY'S VERDICT AS TO ALL FOUR COUNTS OF THE INDICTMENT.

### A. Standard of Review

A defendant challenging the sufficiency of the evidence faces a heavy burden. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997). A jury's

verdict commands the respect of an appellate court, and must be sustained if there is substantial evidence to support it. *United States v. Wilson*, 198 F.3d 467, 469 (4th Cir. 1999). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006) (citation omitted). Furthermore, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *Beidler*, 110 F.3d at 1067 (citation omitted). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Id*. (citation omitted). This is not that case.

### B.    Analysis

Duarte argues that the evidence at trial was insufficient to support his involvement in any of the charged conspiracies – to distribute or import drugs (Counts One and Two), to launder money (Count Three), or to smuggle bulk cash (Count Four). The evidence submitted during the six-day trial was clearly sufficient to support the charges outlined in the four-count indictment against the defendant, and this Court should affirm the convictions.

In *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996), this Court explained that in reviewing challenges to the sufficiency of the evidence

47

supporting a conviction, the court must determine, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt" (internal quotation marks omitted).  As this Court explained in *United States v. Holmes*, 384 Fed. Appx. 219, 2010 WL 254601 (4th Cir. 2010) (unpub.):

> In order to prove the charged conspiracy, the government must establish beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to distribute and possess cocaine with intent to distribute; (2) the defendant's knowledge of the conspiracy; and (3) that the defendant was knowingly and voluntarily a part of the conspiracy.  *See United States v. Yearwood*, 518 F.3d 220, 225-26 (4th Cir. 2008).  "By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement." *Burgos*, 94 F.3d at 857. Consequently, the "conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." *Id.* "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy." *Id.* at 858 (internal quotation marks and alterations omitted). "[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *Id.* (internal quotation marks omitted). It is also not necessary to prove "a discrete, identifiable organizational structure." *Id.* (internal quotation marks omitted). Rather "contemporary drug conspiracies can contemplate only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering

48

to the ultimate demands of a particular drug consumption market." *Id*. (internal quotation marks and alterations omitted). "[T]he fact that a conspiracy is loosely-knit, haphazard, or ill-conceived does not render it any less a conspiracy-or any less unlawful." *Id*. "Under the applicable principles, trial evidence is sufficient to establish a single conspiracy where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results." *Smith*, 451 F.3d at 218.

At trial there was little argument over the existence of a drug conspiracy. From the beginning, it was clear that Villagran, a drug dealer from Guatemala, supplied the co-conspirators in Chicago, Jose Sandoval in Maryland, and Marilyn Navas and her boyfriend in Maryland and Connecticut. The narcotics organization used a money exchange company, Fito Express in Maryland, as well as organization members, to funnel the narcotics proceeds back to Villagran in Guatemala. The defendant acknowledged that the co-conspirators sold cocaine and sent the money back to Guatemala. JA 146. The defendant, however, contended that he was not involved in this conspiracy, either as to the drugs or to the money. In fact, defense counsel, in her opening statement, claimed that the defendant was "duped" by the co-conspirators. JA 140.

The evidence presented at trial established the defendant's criminal involvement in all of the charged conspiracies.

1.    Conspiracy to Distribute and Import Controlled Substances

First, as to Count One, which charged Duarte with conspiracy to possess with intent to distribute and distribution of controlled substances, the evidence established that the defendant assisted the drug conspiracy by at least the following:   (1) attempting to drive approximately  $1.1 million in drug proceeds received from the drug kingpin in Chicago to Guatemala (JA 147-73, 221-57); (2) taking drug proceeds from Edgar Paredes and Navas to Villagran (JA 424, 455-57); (3) taking a Mercedes-Benz from Parades and Navas as payment for a drug debt to Villagran (JA 433, 455); (4) calling Sandoval and telling him to pay Villagran (JA 356-57); (5) helping Navas with her drug debt to Villagran in 2006 (JA 449, 458); and (6) offering Navas drugs in 2006.  JA 459-61.

Second, as this conspiracy involved the importation of drugs from Guatemala to sell throughout the United States, the evidence outlined above was clearly sufficient to establish Duarte's involvement in the importation conspiracy charged in Count Two of the indictment.

The defendant argues that there was no credible evidence linking him to narcotics, and that the monies in his vehicle could not be linked to narcotics. Specifically, he argues that the approximately $1.1 million in his vehicle was never connected to narcotics activity.  He further argues that he was not implicated

50

directly in any of the overt acts in the indictment relating directly to narcotics.

Def. Br. 49-50.

What the defendant misses is that his role in the organization did not require him to directly deliver or sell narcotics.  Rather, the defendant's role was to ensure that the narcotics proceeds got to Villagran in Guatemala.  That is sufficient for conviction of the charged conspiracy counts to import and distribute narcotics. *See United States v. Fernandez*, 559 F.3d 303, 322 (5th Cir. 2009) (person who arguably could have had a minor role and did not possess drugs during the conspiracy – but who performed other roles – is properly accountable for being involved in the conspiracy).

The defendant relies on *United States v. Sanchez-Mata*, 925 F.2d 1166 (9th Cir. 1991), to support his argument that there was insufficient evidence to support his conviction as to Counts One and Two.  There, the Ninth Circuit held that "it is 'well established that a passenger may not be convicted unless there is evidence connecting him with the contraband, other than his presence in the vehicle.'"  925 F.2d at 1169 (quoting *United States v. Ramos*, 476 F.2d 624, 625 (9th Cir.1973)).  In reviewing the evidence, the court noted that the defendant, who was a passenger, "was never seen touching the marijuana and his fingerprints were not on the bags.  He did not have a key to the Audi.  He was never observed with co-

51

defendants at any other time." *Id*. at 1167.  The court reversed his conviction for conspiracy with intent to distribute, explaining that the government had failed to produce sufficient evidence that he "had even a slight connection with the conspiracy." *Id.* at 1168.

In a later decision, the Ninth Circuit distinguished *Sanchez-Mata*, noting that "[a] jury can infer knowledge when an individual *is the driver and sole occupant* of the vehicle." *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003) (emphasis added).

Here, not only was the defendant the driver and sole occupant of the vehicle, but he also had been with the other members of the conspiracy in Chicago, when they loaded up the vehicle with the money and placed various items on top of the compartment, including a broken computer and a broken treadmill, to assist in avoiding detection.  JA 171-72.  The defendant continued to engage in activities in furtherance of the conspiracy, such as transporting the Mercedes-Benz and cash payments from Navas and Edgar to Villagran in Guatemala, telling Sandoval to pay Villagran, and assisting Navas with her drug debts.  In fact, one of the final pieces of evidence relevant to the defendant was his offer to supply drugs to Navas in a recorded telephone call.  JA 459-62.  The sufficiency of the evidence as to the defendant is clearly greater than the passenger in *Sanchez-Mata*.

52

## 2.    Conspiracy to Launder Money and Smuggle Bulk Cash

The money laundering conspiracy charged in Count Three of the indictment was clearly established, as the conspiracy transferred monies from the United States through bulk cash transfers, such as the defendant's attempted transfer of approximately $1.1 million from Chicago to Guatemala (JA 147-73, 221-57); through the Fito money remitting service, which the defendant discussed with Navas on one of the recorded conversations (JA 411-12, 453); through collecting drug proceeds from co-conspirators (JA 422-24, 455-56); and the transfer of items such as the Mercedes-Benz that Navas provided to the defendant and the vehicle the defendant suggested Navas send to Villagran in 2006 in order to satisfy part of her drug debt (JA 424-27, 448).

Lastly, Count Four of the indictment charged the defendant's involvement in a bulk cash smuggling conspiracy.   As mentioned, Duarte attempted to smuggle over $1 million from Chicago to Guatemala.  In March 2006, the defendant discussed with Navas that she would send part of her drug debt to Villagran through "Walter," a reference to Walter Valesquez at Fito Express.  JA 411-12, 453.  This evidence clearly established the defendant's involvement in a bulk cash smuggling conspiracy.

Duarte argues that there was nothing specifically linking the approximately $1.1 million in cash seized from his vehicle to Guatemala, and that the seizure could not serve as a basis for conviction under either Count Three or Count Four of the indictment.  Specifically, he argues that it was plausible that he was going to drive the vehicle to Guatemala to sell it, or that he was without knowledge the money was in the vehicle.  The defendant, rather incredibly, submits that he cannot be held accountable for the money in the vehicle he was driving.  Def. Br. 54.

The argument set forth above relating to the conspiracy to distribute and import narcotics is similarly applicable here.  The jury was entitled to rely on the evidence, and reject the defendant's claim that he was innocent on the basis that he bought and sold cars, and therefore was not part of the conspiracy.   The defendant clearly discussed transferring money from drug proceeds from buyers in the United States to Villagran in Guatemala.  A co-conspirator, Marilyn Navas, knew that Nery carried the proceeds from cocaine sales from Maryland to Guatemala.  JA 455-56.  The defendant entered the United States *58 times* between January 2, 2000 and October 25, 2010.  JA 285-87.  He never filed a CMIR, which he should have filed if he was carrying $10,000 or more.  Duarte was clearly a trusted member of the narcotics conspiracy, JA 448, and its members trusted him with the transportation of the drug proceeds to enable the operation of the illicit enterprise.

54

There was substantial evidence to support the jury's verdict as to all four counts of the indictment.

## VII. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT THE AMOUNT OF COCAINE APPLICABLE TO THE DEFENDANT WAS 63 KILOGRAMS.

### A. Standard of Review

The district court's factual findings about drug quantities attributable to a defendant will be reversed on appeal only if they are clearly erroneous. *United States v. Kiulin*, 360 F.3d 456, 461 (4th Cir. 2004); *United States v. Lopez*, 219 F.3d 343, 348 (4th Cir. 2000). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010). Whether the district court's drug quantity findings are based on a misinterpretation of the Sentencing Guidelines is reviewed *de novo*. *United States v. Fullilove*, 388 F.3d 104, 106 (4th Cir. 2004).

### B. Analysis

As referenced above, law enforcement seized approximately $1.1 million from the vehicle driven by the defendant. The district court, relying on the testimony of the cooperating witnesses, determined that a kilogram of cocaine at

the time of the seizure cost approximately $17,000-$18,000. JA 1032; 419. (Navas-cocaine cost $18,000 per kilo); 345 (Sandoval- cocaine cost $16,000-17,000 per kilo). As such, the district court converted the amount of money seized into the applicable quantity of drugs, and found that the base offense level was 36 under U.S.S.G. § 2D1.1, based on approximately 63 kilograms of cocaine attributable to the defendant. JA 1032. In so finding, the district court determined that the defendant had knowledge of the money and the amount of money was reasonably foreseeable to him. Lastly, the district court rejected the defendant's argument that he was a mere courier, finding that he had a more significant role in the drug organization. JA 1033.

In making this determination, the district court relied on Application Note 5 of the Commentary to U.S.S.G. § 2D1.1, which provides:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant and the size or capability of any laboratory involved.

U.S.S.G. Manual § 2D1.1 cmt. n.5 (2013).

56

Under the Sentencing Guidelines, the defendant is accountable "for all quantities of contraband with which he was directly involved and in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities that are within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3, cmt. n.2. This principle is a logical extension of the well-established rule that a defendant convicted of conspiracy should be sentenced on the basis of his own conduct and any conduct of his co-conspirators that was reasonably foreseeable to him, even where the defendant did not have actual knowledge of specific acts committed by co-defendants in furtherance of the conspiracy. *See United States v. Carter*, 300 F.3d 415, 432 (4th Cir. 2002); *United States v. Carrington*, 301 F.3d 204, 211-13 (4th Cir. 2002); *United States v. Williams*, 986 F.2d 86, 90-91 (4th Cir. 1993); *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) ("The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved.").

In determining drug quantities attributable to a defendant, moreover, a district court need not "err" on the side of caution by adopting a lower quantity of drugs than is supported by the evidence. Instead, it must simply determine that it was "more likely than not that the defendant was responsible for at least the drug

quantity attributed to him." *Kiulin*, 360 F.3d at 361 (citing *United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996)).  In computing the quantity of drugs, moreover, the court is not limited to the quantity charged in the convicted counts, *United States v. Ellis*, 975 F.2d 1061 (4th Cir. 1992), and the court may consider uncharged crimes, and crimes charged in dismissed or acquitted counts.  The court may also include negotiated but undelivered amounts, unless there is evidence that there was no intent or ability to complete the transaction.  *United States v. Brooks*, 957 F.2d 1138, 1150-51 (4th Cir. 1992).

The Sentencing Guidelines also recognize that there are circumstances where there is no drug seizure or the drugs seized do not reflect the scale of the offense.  In such circumstances, the sentencing court "shall approximate the quantity of the controlled substance."  U.S.S.G. § 2D1.1, cmt. n.5. In making this determination, the court may consider, for example, the prices generally obtained for the controlled substance, financial or other records, or similar transactions in controlled substances by the defendant.  *Id*.  Ultimately, the district court's approximation of the amount of drugs will not be found to be clearly erroneous if supported by the evidence in the record.  *United States v. Randall*, 171 F.3d 195, 210-11 (4th Cir. 1999).

Indeed, what the district court did in this case is precisely what is required under this Court's precedent and the above-referenced sentencing guidelines commentary. For example, in the leading case of *United States v. Hicks*, 948 F.2d 877, 881, 883 (4th Cir.1991), this Court upheld the lower court's calculation of drug quantity for possession with intent to distribute cocaine by converting $279,550 in seized cash to cocaine. Specifically, this Court explained that this was the appropriate analysis when there were no drugs seized or the amount of drugs seized failed to reflect the scale of the offense and when the cash was part of the same course of conduct as the offense of the conviction. *See id*. at 882-83; *accord United States v. Kiulin*, 360 F.3d 456, 461 (4th Cir. 2004) (district court did not clearly err in calculating drug quantity for possession with intent to distribute ecstasy by converting cash to its drug equivalent); *United States v. Sampson*, 140 F.3d 585, 592 (4th Cir.1998) (proper for a district court to convert cash amounts linked credibly to the narcotics activity).

The defendant argues that this amount should not be attributable to him on the basis that he did not know how much money was in the secret compartment in his vehicle. In addition, he argues that it was entirely likely that he may not have known how much money was in the vehicle he was driving, as drug organizations

59

typically do not share that information with couriers in order to mitigate the risk of theft.  JA 570.

What the defendant clearly does not address is the fact that "actual knowledge of the type or quantity of contraband is not critical to the drug quantity determination."  *United States v. Fullilove*, 388 F.3d 104, 108 (4th Cir. 2004). This Court, as support for its reasoning, cited to the relevant conduct guideline, U.S.S.G. § 1B1.3, cmt. n.2(a)(1) ("[A] defendant who transports a suitcase knowing that it contains a controlled substance ... is accountable for the controlled substance in the suitcase *regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance*.") (emphasis added); *see United States v. Diaz-Calderon*, 216 Fed. Appx. 331 at *5 (4th Cir. 2007) (unpub.) ("A defendant's lack of knowledge or foresight of a specific quantity of drugs is irrelevant for sentencing purposes where such a direct connection exists.").  The same reasoning applies to the defendant's responsibility for the amount of money in the vehicle he was driving.  As the Tenth Circuit has explained in this context:

> We acknowledge that a defendant's sentence may be influenced sometimes by factors outside of the defendant's knowledge and control.  Indeed, happenstance and sheer luck (or lack thereof) may play a part in a defendant's sentence for certain crimes under the Guidelines. For example, two otherwise equally culpable bank robbers may face different sentences based solely on the different amounts of money that tellers happened to place in their bags; and two otherwise

60

equally culpable drug trafficking mules may face different sentences based only on the different quantities of drugs that unbeknownst to them were given to them for transport. *See*, *e.g.*, U.S.S.G. § 2B3.1(b)(7), § 2B3.1 cmt. n. 3 (2008) (increasing the offense level for robbery based on the value of the property taken); *id.* § 2D1.1(c) (prescribing the increase in base offense level depending upon the quantity and type of controlled substance). However, that does not mean that federal sentencing is not focused upon imposing punishment based upon an individual defendant's criminally culpable conduct. Although the different circumstances that produce these disparate sentencing outcomes may not have been within the control of the defendants or even within their ken, those circumstances nonetheless stem from, and are closely tied to, their individual criminal activity and the resulting harm—that is, their acts of robbing a bank and demanding money from the teller, and their acts of taking delivery of and ferrying illegal drugs.

*United States v. Nacchio*, 573 F.3d 1062, 1082 n.16 (10th Cir. 2009).

Therefore, the district court did not err in determining that the base offense level attributable to the defendant was 34 under U.S.S.G. § 2D1.1.

61

## CONCLUSION

For the reasons set forth herein, this Court should affirm both Duarte's

convictions and his sentences.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

_____/s/_____
Bonnie S. Greenberg
April 25, 2014                               Assistant United States Attorney

62

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument in not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using:

**Microsoft Word, Times New Roman, 14 Point**


2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains 13,615 words.


I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


_____/s/_____
Bonnie S. Greenberg
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 25, 2014, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF user:

Matt Kaiser, Esq.
1400 I Street, N.W., Suite 525
Washington, D.C. 20005

_____/s/_____
Bonnie S. Greenberg
Assistant United States Attorney